Jordan A. Kroop
Bradley A. Cosman
**PERKINS COIE LLP**
2901 N Central Ave | Suite 2000
Phoenix, Arizona 85012
(602) 351-8000
Email: jkroop@perkinscoie.com
        bcosman@perkinscoie.com

*Proposed Counsel to Debtor-In-Possession*

UNITED STATES BANKRUPTCY COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| In re | Chapter 11 |
| **CORNBREAD VENTURES, LP,** a Texas limited partnership, | Case No. 2:17-bk-12877 BKM |
| EIN 47-4482094 | |
| Debtor | **DECLARATION OF MICHAEL STONE IN SUPPORT OF FIRST-DAY PLEADINGS** |

MICHAEL STONE, under penalty of perjury, states:

1.   This declaration relates to and supports the voluntary Chapter 11 petition and first-day pleadings of Cornbread Ventures, LP, debtor-in-possession (the "**Debtor**") in this Chapter 11 case, filed on October 30, 2017 (the "**Petition Date**").

2.   I am the principal shareholder of the Debtor's general partner and the Debtor's chief executive officer since the Debtor's formation in July 2015. I am intimately familiar with all aspects of the Debtor's business and financial affairs. I submit this Declaration on personal knowledge, accumulated in my capacity as the president of the Debtor's general partner (and, thus, the Debtor's senior-most executive officer) and in direct communication with the other members of the Debtor's management team. The statements set forth below are true to the best of my personal knowledge. If called to testify to those statements, I would do so willingly and competently.

# THE DEBTOR

**The Debtor's Business**

3.    The Debtor was formed as a Texas limited partnership in July 2015 to pursue and complete an acquisition of nine restaurants and associated assets then owned by debtors ("**Old Z'Tejas**") whose Chapter 11 cases were jointly administered under *In re Z'Tejas Scottsdale, LLC, et al.* (Case No. 2:15-bk-09178-PS, the "**Prior Case**") in this Court. The Debtor engaged in a series of lending transactions before and at the beginning stages of the Prior Case, which ultimately culminated in this Court's approval of a sale to the Debtor of substantially all Old Z'Tejas's operating assets, consisting of nine restaurants located in the metro areas of Phoenix, Arizona and Austin, Texas, under Bankruptcy Code §§ 363 and 365 under an order entered on September 29, 2015. The sale closed during the first week of October 2015.

4.    Since then, the Debtor has owned and operated the nine restaurants in leased premises acquired from Old Z'Tejas, comprising:

a.    Z'Tejas Southwestern Grill, 10625 N. Tatum Blvd., Phoenix, AZ 85028 ("**Gateway**");

b.    Z'Tejas Southwestern Grill, 7014 E. Camelback Road, Scottsdale, AZ 85251 ("**Scottsdale**");

c.    Z'Tejas Southwestern Grill, 20 W. 6th Street, Tempe, AZ 85281 ("**Tempe**");

d.    Z'Tejas Southwestern Grill, 7221 W. Ray Road, Chandler, AZ 85226 ("**Chandler**");

e.    Z'Tejas Southwestern Grill, 1525 E. Bethany Home Road, Phoenix, AZ 85014 ("**Bethany**");

f.    Z'Tejas Southwestern Grill, 10525 W. Parmer Lane, Austin, TX 78717 ("**Avery Ranch**");

2

g.     Z'Tejas Southwestern Grill, 9400 Arboretum Blvd., Austin, TX 78759 ("**Arboretum**");

h.     Z'Tejas Southwestern Grill, 1110 W. 6th Street, Austin, TX 78703 ("**6th Street**"); and

i.     Taco Guild Gastropub, 546 E. Osborn Road, Phoenix, AZ 85012 ("**Taco Guild**").

5.   All Z'Tejas locations are full-service, casual dining establishments offering authentic but innovative Southwestern fare in a casual, contemporary atmosphere. The Z'Tejas menu, which differs slightly among the Z'Tejas locations, focuses on dishes inspired by the classic cuisines of Arizona, California, Louisiana, New Mexico, and Texas. Historically, the Z'Tejas restaurants have appealed to a broad clientele but are particularly popular among middle- and upper-income families, young professionals, and empty-nesters. Each Z'Tejas location has a distinct look and feel and distinct décor ensuring that the eight Z'Tejas restaurants look less like "chain" restaurants than many other casual dining chains.

6.   Taco Guild offers creative, Mexican-inspired cuisine and artisanal cocktails in a truly distinctive setting—a converted stone-and-wood church originally constructed on the site in mid-town Phoenix in 1893 and operated as the Bethel Methodist Church until 2012. Stained glass windows, vaulted ceilings, masonry arches, and an eclectic mix of upcycled plateware compliment cutting-edge interpretations of Mexican street tacos and flavors of Baja California and the Mexican interior that has garnered countless rewards, accolades, and rave reviews, including being named the second-best Mexican restaurant in the country by the Travel Channel's "Food Paradise" show.

137305146.2

**Operational Funding**

7. From its inception, the Debtor received equity financing from its general partner and from its several limited partners. The Debtor replaced certain of its initial equity financing with a senior secured debt facility from JPMorgan Chase Bank, N.A. ("**JPMC**").

8. The Debtor as borrower and JPMC as lender originally entered into a *Credit Agreement* dated as of October 19, 2015, later amended by the *First Amendment of Credit Agreement* dated as of October 19, 2016, the *Second Amendment of Credit Agreement* dated as of October 19, 2016, and the *Third Amendment of Credit Agreement* dated as of August 19, 2017 (collectively, the "**Credit Agreement**"). Under the Credit Agreement, the Debtor executed, among other promissory notes, a *Term Note* dated October 19, 2015 (the "Term Note") in the original principal amount of $2,000,000, maturing on April 19, 2020. The Debtor and JPMC executed a *Modification Agreement* as of August 19, 2017, under which monthly payments on the Term Note were amended to be interest-only for the months of August, September, and October of each year, to include principal of $62,500 per month plus accrued interest for the months of November, December, January, February, March, and April of each year, and to include principal of $41,666.67 plus accrued interest for the months of May, June, and July of each year.

9. The Debtor's obligations under the Term Note are secured by, among other things:

a. The *Ground Leasehold Deed of Trust, Assignment of Leases and Rents, Security Agreement and Financing Statement* (the "**Deed of Trust**") dated as of October 19, 2015, in JPMC's favor and recorded on or about that date on the Official Records of Maricopa County Recorder, Arizona, perfecting a security interest in the Debtor's leasehold interest under a ground lease for the Chandler location; and

4

b. A *UCC Financing Statement* filed with the Texas Secretary of State on December 4, 2015, perfecting JPMC's security interest in "All assets of Debtor, whether now owned or hereafter acquired or arising." This UCC filing is supported by and relates to the *Continuing Security Agreement* dated on or about September 21, 2015 (the "**Security Agreement**"), granting JPMC a security interest in all "Collateral" defined in that agreement, which is essentially all the Debtor's assets without exception.

10. As of the Petition Date, the Debtor owed principal under the Term Note of $1,374,999.95. Accrued interest owing under the Term Note as of October 19, 2017, is $11,830.73.

11. The Debtor also executed a *Line of Credit Note* dated on or about September 21, 2015 (the "**LOC Note**"), in JPMC's favor establishing a secured line of credit of up to $500,000.00. Under the Security Agreement, the Debtor's obligations under the LOC Note are secured by the same security interests in JPMC's favor that secure the Debtor's obligations under the Term Note. As of the Petition Date, the Debtor owed principal under the LOC Note of $461,000.00. Accrued interest owing under the LOC Note as of October 19, 2017, was $925.20.

12. The Debtor also has a credit card issued by JPMC with a current balance, as of the Petition Date, of $69,506.00. Under the Security Agreement, the Debtor's credit card obligations to JPMC are secured by the same security interest in JPMC's favor that secured the Debtor's other obligations to JPMC.

13. The only other purported security interest of record that the Debtor is aware of is a UCC Financing Statement filed with the Arizona Secretary of State on January 29, 2016, purporting to establish a security interest in "all of Debtor's right, title and interest in the furniture, fixtures and equipment located in, or about" the premises of the Bethany restaurant in favor of Bethany Core, LLC, the predecessor landlord of that now-closed location.

137305146.2

**Circumstances Leading to the Debtor's Bankruptcy Filing**

14. Since the Debtor's acquisition of its restaurants two years ago, the Debtor's consolidated operations over its nine locations have failed to generate sufficient cash flow to cover all operating expenses, to meet long-term lease obligations to some of its landlords, and to service the Debtor's obligations to JPMC. Most recently, the Debtor's EBITDA for the trailing six months as of September 2017 was sharply negative. The Debtor's consolidated losses were caused primarily by disappointing sales and negative margins at four of the Debtor's Z'Tejas restaurants—Scottsdale, Tempe, Bethany, and Avery Ranch. The Debtor attributes this lack of profitability, particularly in these four locations, to steadily increasing costs for commodities and labor, coupled with the overall downturn in demand in the casual dining sector, in which some customers have shifted to cheaper, faster dining alternatives and others, especially younger customers, have begun to prefer non-chain, locally-focused restaurants (like Taco Guild) despite comparatively higher prices.

15. Over the course of several months leading up to the Petition Date, the Debtor actively sought new infusions of capital which, if obtained, would have enabled the company to avoid or at least postpone more drastic operational decisions that necessitated this Chapter 11 filing. To address the Debtor's financial future and the four underperforming locations that have imperiled the value and the continuity of the five much stronger locations (6th Street, Arboretum, Gateway, Chandler, and Taco Guild), the Debtor engaged an advisory firm to explore sources of new equity or debt financing to improve the Debtor's balance sheet and support cash flow needs and engaged in candid discussions with the landlords at Avery Ranch, Bethany, Scottsdale, and Tempe regarding possible renegotiation or early buyouts of the leases.

16. The pursuit of new capital took many forms and considerable effort was exerted. Over the past several months, the Debtor targeted multiple operational and

137305146.2

cash-flow strategies to address the Debtor's financial condition, including outsourcing its accounting functions, implementing a new inventory system, and making personnel adjustments. In connection with the Debtor's pursuit of new capital, the Debtor hired Horne LLP as its new accounting firm and requested a re-evaluation of the Debtor's financial condition and cash flows. Having been most recently given significant additional clarity and more reliable data in that regard, the Debtor determined that results at the Scottsdale, Tempe, Bethany, and Avery Ranch locations had been having a more profoundly detrimental effect on the Debtor's financial condition as a whole than the Debtor had previously thought.

17. Additionally, within just three weeks before the Petition Date, advanced discussions with a UK-based restaurant group, which had been ongoing for some two months, regarding capital investment or acquisition strategies collapsed. The abrupt and unanticipated loss of that opportunity, coupled with the failure during the last week before the Petition Date in getting adequate agreements from the Scottsdale, Tempe, Bethany, and Avery Ranch landlords, left the Debtor with no choice but to terminate operations at those four troubled locations to reduce or eliminate ongoing cash-flow losses and pursue a restructuring of the Debtor's debts based on a retention and growth of the Debtor's five stronger-performing locations.

18. The Debtor made several final attempts last week and even earlier this morning to negotiate lease buy-outs with the landlords at the four poorly-performing locations. Had the Debtor been able to reach agreement with all four landlords, it may have been able to stave off this Chapter 11 case. The Debtor made what it believed to be attractive cash offers to each of the landlords that would have given each of them a greater recovery than what the Debtor reasonably anticipates they would recover in a Chapter 11 case, where rejection damages are capped under Bankruptcy Code § 502(b)(6) and treated as general unsecured claims. Although at least one of the affected landlords initially indicated an interest in accepting the

137305146.2

Debtor's offer, the Debtor did not receive sufficient traction with three others to obviate a Chapter 11 filing. As a result of the failure of the Debtor's last-ditch effort to resolve the claims of these four landlords out of court, the Debtor faced imminent litigation costs associated with landlord enforcement actions, which included the Bethany landlord locking the Debtor out of the Bethany location on Friday, October 20, 2017. The Debtor permanently closed that location that same day and permanently closed the Scottsdale, Tempe, and Avery Ranch locations on Sunday, October 22, 2017. Immediately after, the Debtor prepared the filing of its Chapter 11 case to avail itself of the tools Chapter 11 offers to assist the Debtor in protecting and enhancing the value and ongoing operations of the five remaining locations for the maximum benefit of the Debtor's creditors.

**Debtor's Planned Restructuring**

19. The Debtor intends to complete this Chapter 11 case quickly and efficiently, pursuing either a structured sale of the Debtor's operating assets or a plan of reorganization based on the profitable and promising future operations of the Debtor's five remaining locations (Chandler, Gateway, 6th Street, Arboretum, and Taco Guild). Given the immediate cost savings associated with the closures of the Scottsdale, Tempe, Bethany, and Avery Ranch locations shortly before the Petition Date, the Debtor's operations are already stabilized and projected to be cash-flow positive such that the Debtor believes it has obtained JPMC's support for its restructuring efforts through consensual use of cash collateral. No additional closures are even remotely anticipated. Should additional liquidity be needed to pursue and complete its chapter 11 restructuring, the Debtor has already preliminarily negotiated a favorable debtor-in-possession financing facility with an affiliate of the Debtor's general partner that would provide up to $500,000 of liquidity, as needed, on terms advantageous to the estate and secured by a lien junior to JPMC's lien. Given the present and likely future operational success at its five open locations and availability

8

of both consensual cash collateral use and up to $500,000 of additional liquidity, the Debtor is confident that its Chapter 11 restructuring efforts are set up, from the outset, to succeed and to provide meaningful recoveries to all creditors and the assurance of future business with the Debtor's highly-valued vendors. This approach will not only maximize the value of the Debtor's operating assets for the benefit of its creditors but will preserve scores of jobs in two metro areas, will ensure the continuation of the Debtor's mutually-beneficial relationships with its vendors, and will enable the Z'Tejas and Taco Guild restaurants to continue delivering a high quality, much-loved dining experience to their customers long into the future.

## FIRST-DAY PLEADINGS[1]

### Wage and Benefits Motion

20. As of the Petition Date, the Debtor employed 227 hourly employees, 80 of whom are hourly full-time employees, and 147 of whom are hourly part-time employees. None is covered by a collective bargaining agreement. An affiliate of the Debtor, Cornbread Management Inc. ("**CMI**"), employs 35 full-time salaried individuals that work exclusively in the Debtor's business in on-site restaurant management and central-office administrative positions.

21. The hourly employees all work at the Debtor's restaurants—cooks, bartenders, servers, and other restaurant-specific functions. The salaried individuals perform critical managerial functions at the restaurants and those in the Debtor's central offices in Phoenix and Austin perform critical administrative, central management, human resources, and other tasks. All employees' skills and their knowledge and understanding of the Debtor's operations and customer relations are essential to the

---

[1] Any capitalized terms used but not defined in this Declaration have the meanings given to them in the applicable, contemporaneously-filed motions.

137305146.2

effective reorganization of the Debtor's business. Without the employees' continued services, an effective restructuring of the Debtor will not be possible.

22. The Debtor's obligations to its employees include wages, salaries, payments and payroll deductions for employee benefits, withholdings, and limited reimbursements for expenses initially borne by a few individual employees. Before the Petition Date, the Debtor customarily either paid or withheld all of these obligations in the ordinary course of business.

23. The hourly employees are paid bi-weekly, every other Wednesday, one week in arrears, through checks drawn from the Debtor's bank account as and when employees negotiate their payroll checks. The salaried employees are also paid bi-weekly, every other Wednesday, one week in arrears, through direct deposit or checks. The Debtor transfers funds to CMI Inc. to fund the salaried employees' payroll, immediately via direct deposit for those employees that have electronic deposits and drawn from CMI Inc.'s bank account as and when employees negotiate their checks. The payroll relating to Arizona-based employees and corporate staff and the payroll relating to Texas-based employees are staggered in alternating weeks such that there is one payroll made every Wednesday.

24. The Debtor's next payroll (for Arizona-based hourly employees and salaried managerial and staff employees at the Debtor's Arizona restaurants and central offices) is scheduled for November 1, 2017, relating to the period from October 12, 2017, through October 25, 2017, all of which is prepetition. The aggregate hourly wages for this payroll will be approximately $85,160.00. The aggregate salaries for this payroll (to be transferred to CMI for disbursement) will be approximately $60,500.00.

25. The Debtor's next payroll (for both salaried and hourly employees at the Debtor's Texas restaurants), scheduled for November 8, 2017, relates to the period from October 19, 2017, through November 1, 2017, approximately half of which

137305146.2

relates to the prepetition period. The aggregate hourly wages for this payroll will be approximately $42,700.00. The aggregate salaries for this payroll (to be transferred to CMI for disbursement) will be approximately $31,500.00.

26. The Debtor is required by law to withhold from an employee's paycheck amounts related to federal and state income taxes and social security, FICA, and unemployment taxes (collectively, the "**Withholding Taxes**") for remittance to the appropriate governmental authorities. The Debtor must also match from its own funds social security and Medicare taxes withheld and pay (based on a percentage of gross payroll) additional amounts for state and federal unemployment insurance (the "**Employer Payroll Taxes**"). The Debtor withholds a total of approximately $65,900 from all employees' paychecks for Withholding Taxes during each payroll, which are funded through a direct withdrawal from the Debtor's payroll account on the day payroll is made. The Debtor remits a total of approximately $36,300 for Employer Payroll Taxes each payroll. To the extent that any payroll has not been processed for the prepetition period, the Debtor has not funded the either the Withholding Taxes or the Employer Payroll Taxes. Accordingly, the Debtor seeks authority to continue to process and remit all prepetition Withholding Tax and Employer Payroll Tax obligations in the ordinary course of business.

27. Operational expenses incurred on the Debtor's behalf ("**Employee Expenses**") consist of expenses accrued by corporate employees and restaurant managers who submit those expenses to the Debtor for reimbursement. Employee Expenses include, among other things, business travel expenses, local travel expenses, parking, and episodic expenses to local tradesmen for repairs and maintenance at restaurant facilities. Generally, the Debtor expects employees to submit Employee Expenses for reimbursement as soon as possible after they are incurred but, because some employees may not yet have submitted their Employee Expenses incurred before the Petition Date, the Debtor cannot accurately estimate the amount of Employee

11

Expenses remain unreimbursed for the prepetition period. Based on historical averages, the Debtor believes that there may be only approximately $58.89 in unreimbursed Employee Expenses attributable to the prepetition period. The Debtor seeks authority to reimburse employees for their prepetition Employee Expenses in the ordinary course of business. If the Debtor is unable to do so, the individual employees will unfairly bear the burden of having paid the Debtor's expenses from their personal funds, severely undermining employee morale at a time with these management-level employees' best efforts are crucial to the Debtor and its success in this Chapter 11 case.

28. All full-time employees are eligible to participate in medical, dental, vision, life, and accidental death and dismemberment (AD&D) insurance plans offered by the Debtor (the "**Benefit Plans**"). Under the Benefit Plans, employees and the Debtor each make monthly premium payments. To maintain employee morale and not unfairly impose hardships on its workforce, the Debtor seeks authority to pay any outstanding unpaid premiums, deductibles and other claims in respect of the Benefit Plans accruing before the Petition Date and to continue to honor prepetition policies relating to the Benefit Plans.

    a. **Hourly Employee Medical.** All full-time hourly employees are eligible to participate in a medical plan offered by the Debtor through Cornerstone Preferred Resources. Under this plan, the Debtor pays an administration fee and premium to Cornerstone in the approximately amount of $4,800 per month. employees and the Debtor each make monthly premium payments. This amount covers the consulting fee payable to the administrator and a portion of the stop-loss insurance under the medical plan, a fee to the medical broker, and COBRA coverage. Approximately 25% of the Debtor's eligible hourly employees receive medical benefits under the Debtor's plan, which is self-funded by the participating employees. The monthly fee/premium paid to the Administrator is paid near the last day of the coverage

137305146.2

month. The plan is self-insured up to $5,000 per claim per individual and any excess is covered by the stop-loss insurer. A portion of the premium to be paid to Cornerstone at the end of October will necessarily relate to the period before the Petition Date as well as the self-insured claims paid bi-weekly. Accordingly, the Debtor seeks authority to pay all prepetition amounts owing to Cornerstone relating to the Debtor's medical insurance plan for hourly employees to ensure continuity of the policy for those employees' benefit.

b. **Salaried Employee Medical.** All salaried employees (which, again, are technically employed by CMI) are eligible to participate in a separate medical plan through Blue Cross Blue Shield ("**BCBS**"). Under this plan, CMI, with funds provided by the Debtor, pays a premium in the approximate amount of $36,000 per month to BCBS, which also covers the applicable consulting fee and a portion of the stop-loss insurance under that plan, a fee to the medical broker, and COBRA coverage. Approximately 70% of the eligible salaried employees (whose services are all rendered 100% to the Debtor despite that they are technically employed by CMI) receive medical benefits under this plan, which is fully insured, with premiums paid by the participating employees and the Debtor on a cost-sharing basis. The monthly premium paid to BCBS is paid on the first day of the coverage month. For that reason, it is unlikely that any portion of the premium due to BCBS at the beginning of November will relate to the period before the Petition Date. Nonetheless, out of an abundance of caution, the Debtor seeks authority to pay (through distributions to CMI) any prepetition amounts owing to BCBS relating to this medical insurance policy to ensure continuity of the policy for the employees' benefit.

c. **Salaried Employee Dental and Vision.** The Debtor offers voluntary dental and vision insurance programs to salaried employees administered by Companion Life. Approximately 20 salaried employees of CMI are covered under the dental and vision programs. Coverage is paid for by the participating employees through payroll

contributions. Accordingly, the Debtor does not believe that, as of the Petition Date, it owes any amounts in respect of insurance coverage for the dental and vision programs. Out of an abundance of caution, however, the Debtor seeks authorization to pay any such prepetition claims when they come due in the ordinary course of business.

d. **COBRA.** The Debtor seeks to continue to perform any obligations it has under Section 4980B of the Internal Revenue Code to administer Continuation Health Coverage (26 U.S.C. § 4980B) ("**COBRA**") regarding former employees and their covered dependents. Cornerstone is the Debtor's third-party COBRA administrator for hourly employees, and BCBS is the third-party COBRA administrator for salaried employees. To maintain employee morale and ensure the orderly administration of the estate, the Debtor requests authority to continue meeting its COBRA-related obligations in the ordinary course of business.

e. **Group Life and AD&D Insurance.** The Debtor offers eligible employees premium-based life insurance coverage and AD&D insurance through Allstate. Basic life and AD&D insurance coverage is made available to full-time employees and paid by the Debtor in the approximate amount of $1,140 per month. Voluntary life and AD&D and short-term and long-term disability insurance is made available to employees and their dependents; employees are responsible for the cost of those voluntary insurance coverages. The monthly premiums paid by the Debtor for basic life and AD&D insurance coverage are paid at the beginning of each month for coverage during that month. Although the Debtor does not believe that any prepetition amount is owed to Allstate in this regard, out of an abundance of caution and to maintain employee morale, the Debtor requests authority to pay any prepetition costs related to life and AD&D insurance benefits in the ordinary course of business.

137305146.2

f. **Workers' Comp.** Under Arizona and Texas law, the Debtor must provide workers' compensation insurance to its employees at the statutorily-required levels for employment-related injury claims. The Debtor maintains a workers' compensation benefits program through Farmer's Insurance. This program provides benefits to all the Debtor's employees for claims as well as premiums, deductibles, and other charges (the "**Worker's Comp Obligations**"). Farmers acts as a third-party administrator and provides guaranteed cost insurance coverage at the statutorily-required level in Arizona and Texas, as applicable. The Debtor pays Farmers approximately $31,221.80 per month for this program. Although the Debtor is current with Farmers, the timing of the Petition Dates means that the Debtor owes Farmers certain prepetition amounts on account of the monthly premium. The Debtor seeks authority to pay, in its discretion, prepetition claims arising from the Worker's Comp Obligations that come due after the Petition Date.

29. The Debtor's employees rely on their full compensation and reimbursement of expenses to meet their daily living expenses and will be exposed to significant financial difficulties if the Debtor is not permitted to pay the Employee Obligations and Employee Benefits. The Debtor's failure to meet its obligations to its employees in the ordinary course would destroy employee morale and likely cause most hourly employees to simply stop showing up to work and management-level employees to resign, inflicting immediate and pervasive damage to the Debtor's ongoing business operations. (This is true even with respect to employees of the Debtor's four recently-closed locations. Failing to pay the former employees of those locations their last paychecks will become known to the Debtor's ongoing employees and would likewise destroy employee moral and lead to massive, unmanageable attrition at the Debtor's operating restaurants.) The resulting harm to the Debtor's estate would be immediate, irreparable, and incalculable.

137305146.2

**Customer Program Motion**

30. In the ordinary course of its business, as is customary in the food and beverage industry, the Debtor has engaged in various customer programs and policies described below (the "**Customer Programs**") to develop loyalty among, and sustain a positive reputation and relationship with, the Debtor's restaurant patrons. The Customer Programs are designed to ensure customer satisfaction, develop new and sustain existing customer relationships and loyalty, improve profitability, and generate goodwill for the Debtor and its products and services while effectively meeting sophisticated competition in the casual dining market. As of the Petition Date, the Customer Programs consist of Gift Cards, Cornbread For a Cause (both terms defined below), and coupon and discount programs.

31. Especially now that its reorganization case has begun, the Debtor must promptly assure customers of its continued ability to satisfy its prepetition and postpetition obligations under the Customer Programs to maintain its valuable customer base, reputation, and goodwill, and to maximize the Debtor's ability to reorganize around its ongoing operations. Any impediment to the Debtor promptly honoring these obligations would severely undermine goodwill and would undoubtedly lead to substantial loss of customer patronage. Continued use of the Customer Programs, on the other hand, will enable the Debtor to protect its customer base and revenue growth opportunities. Consequently, the Debtor seeks the authority to maintain and administer the Customer Programs in the ordinary course of business.

32. *Gift Cards.* As part of its operations, the Debtor sells gift cards (the "**Gift Cards**") that are accepted in the Debtor's restaurants as payment for purchases in the ordinary course of the Debtor's business. The Debtor pays an administration fee to GF Promotions for administering this program. The Gift Cards may be purchased at the Debtor's restaurants, online on the Debtor's websites, or from various other

16

resellers that are authorized to issue Gift Cards. Once purchased, a Gift Card may be used like cash for purchases at the Debtor's restaurants but may not be redeemed for cash or monetary credit except under limited circumstances where required by applicable state law. Once purchased, the Gift Cards are "activated" and may then be redeemed at any time with no expiration date.

33. Online and retail purchases are processed by third-party processors, Card Marketing Services and InComm, respectively. The Debtor utilizes third-party administrator NCR to track purchases and redemptions of Gift Cards purchased at the Debtor's restaurants, online, and at retail locations. (Card Marketing Services, InComm, and NCR are, collectively, the "**Gift Card Parties**.") The Debtor maintains detailed transaction data regarding the sale of Gift Cards on NCR's system. The Debtor neither tracks nor has any information about the identity of Gift Card holders. Based on a review of its business records and prior holder activity, the Debtor expects that, as of October 23, 2017 approximately $1,032,718.09 of purchased Gift Cards are outstanding and may be redeemed at the Debtor's restaurant locations. Several hundred thousand dollars of this amount relate to Gift Cards issued by the Debtor's predecessor in 2015 or before, dating back some eleven years. A significant percentage, possibly 40%, of the overall Gift Card liability relates to old Gift Cards that have never been and may never be redeemed.

34. The Debtor pays the Gift Card Parties approximately $500 per month for service fees. As of the Petition Date, the Debtor estimates that the Debtor owes NCR $500 on account of prepetition obligations relating to the Gift Cards. The Debtor does not believe it owes any amount to Card Marketing Services or InComm on account of prepetition obligations relating to the Gift Cards.

35. *Coupons and Discount Programs.* The Debtor, from time-to-time, distributes coupons and promotional materials to customers redeemable for a certain dollar amount, percentage discount, or free meal. The Debtor believes that these coupons

137305146.2

result in less than $100,000 of aggregate incremental gross revenue (net of the applicable discount).

36. *Cornbread For a Cause.* Launched in December 2015, Z'Tejas's "Cornbread For a Cause" is the Debtor's corporate giving program. Its mission is to raise funds for charitable organizations serving the Greater Phoenix and Austin communities. The Debtor raises its funds for charitable giving through the proceeds from the sale of Z'Tejas's famous, freshly-made cornbread. To date, the Debtor has donated over $200,000 to local charities under the Cornbread For a Cause program. In light of the obvious benefits to underserved segments of the Phoenix and Austin communities, to say nothing of the reputational benefits the Debtor derives from this program or the increased revenue derived from customer enthusiasm for helping generate donations, the Debtor seeks authority to continue the Cornbread For a Cause program in the ordinary course of business, including the administering of funds donated prepetition.

37. The necessity of the Customer Programs in the Debtor's industry cannot be overstated. In the casual dining segment, particularly, the Customer Programs are standard practice. If the Debtor fails to honor its obligations under the Customer Programs, the Debtor risks alienating its customers and encouraging them to take their patronage to the Debtor's competitors. Maintaining the Customer Programs is particularly critical at the beginning stages of this reorganization case because the Debtor must increase its customer engagement, frequency, and retention and build on the good will and reputation the Debtor has cultivated in its markets. These efforts (and the Debtor's reorganization) will be stymied if customers are unable to take advantage of the very inducements that the Debtor uses to encourage patronage. The prepetition obligations owed by the Debtor under the Customer Programs qualify for postpetition payment because, if the Debtor does not honor these obligations, the Debtor's hard-earned reputation and brand loyalty will be severely

137305146.2

compromised, irreparably harming the Debtor's prospects to maximize value through this Chapter 11 case.

38. The continuity, viability, and revitalization of the Debtor's business around the Debtor's five operating locations depends on developing, maintaining, rewarding customer loyalty and patronage. The Debtor now has and expects to continue to have more than sufficient resources available to maintain all its Customer Programs and to pay its obligations arising under them.

39. The Debtor additionally requests that its banks be authorized, at the Debtor's request, to receive, process, honor, and pay all checks presented for payment of, and to honor all the Debtor's fund transfer requests related to, the Debtor's obligations under the Customer Programs, whether those checks were presented or fund transfers requested before or after the Petition Date, if sufficient funds are available in the applicable accounts to make the requested payments. The Debtor represents that these checks are drawn on identifiable disbursement accounts and can be readily identified as relating directly to the authorized payment of the obligations to customers arising under the Customer Programs. As such, the Debtor believes that checks other than those relating to authorized payments will not be honored inadvertently.

**Sales and Use Tax Motion**

40. In the ordinary course of business, the Debtor incurs or collects and remits an assortment of sales, use, and other similar taxes in connection with the operation of its restaurants. In both Maricopa County, Arizona and Travis County, Texas (the counties in which the Debtor operates), the Debtor must collect sales taxes from its customers on a per-sale basis and then remit those sales taxes to the applicable authority. Additionally, the Debtor may incur and collect use taxes when it purchases taxable products for which no sales tax was charged by the Debtor's vendors. The sales and use taxes collected or incurred are typically remitted to the taxing authori-

19

ties in the month or quarter following the month or quarter in which the related transactions occurred. In general, sales taxes accrue on a per-transaction basis and are calculated based on a statutory percentage of the sale price. The Debtor paid approximately $2,441,640 in Taxes in 2016 and approximately $1,573,505 in Taxes for the first seven months of 2017. The Debtor believes it has collected approximately $119,000 of Taxes attributable to prepetition transactions that have not yet been remitted to taxing authorities as of the Petition Date. The Taxes consist entirely of current obligations and do not represent catch-up payments.

41. The Debtor additionally requests that its bank be authorized, at the Debtor's request, to receive, process, honor, and pay any and all checks presented for payment of, and to honor all the Debtor's fund transfer requests related to, the Debtor's obligations related to the Taxes, whether those checks were presented or fund transfers requested before or after the Petition Date, if sufficient funds are available in the applicable accounts to make the requested payments. The Debtor represents that these checks are drawn on identifiable disbursement accounts and can be readily identified as relating directly to the authorized payment of obligations related to the Taxes. As such, the Debtor believes that checks other than those relating to authorized payments will not be honored inadvertently.

**Cash Management Motion**

42. In the ordinary course of business, the Debtor uses a centralized cash management system of inter-related bank accounts designed to efficiently collect, transfer, and disburse funds generated through the Debtor's operations and to accurately record those transactions as they are made (the "**Cash Management System**"). The principal components of the Cash Management System are described in detail below.

43. All the Debtor's bank accounts are located at JP Morgan Chase Bank ("**JPMC**"). At the center of the Debtor's Cash Management System is the Debtor's general Operating Account, which the Debtor uses to satisfy accounts payable, debt

service, taxes, and other ordinary course operating obligations. The Debtor also maintains the following additional accounts at JPMC: (a) a payroll account used only to fulfill the Debtor's payroll obligations to its hourly employees; (b) a management payroll account used only to fulfill the Debtor's payroll obligations to its management-level and office staff employees, who are technically employees of the Debtor's non-debtor affiliate, Cornbread Mgmt. Inc.; and (d) a loan payment account, which is used only to fulfill the Debtor's debt service payments to JPMC. All the Debtor's bank accounts, which are listed with account numbers and current balances on **Exhibit A** to the Debtor's cash management motion (the "**Bank Accounts**") are FDIC-insured and are held at JPMC, a US Trustee-approved depository institution.

44. The Debtor's principal source of cash flow stems from the revenue that it generates through the operations of its restaurants (the "**Revenue**"). All Revenue is deposited directly into the operating account. Revenue deposited into the operating account is used to pay vendors and cover other operating expenses. Two days before employee payroll, amounts necessary to cover the next payroll (which includes wages, salary, contributions to employee benefit accounts, and other customary employee-related amounts) are moved from the operating account into the two payroll accounts. Once a month, funds due to JPMC for debt service are deposited into the loan payment account.

45. The Debtor seeks a waiver of the United States Trustee's requirement that the prepetition Bank Accounts be closed and that new post-petition "debtor-in-possession" accounts be opened. If enforced in this case, that requirement would cause significant and unnecessary disruption in the Debtor's business, would cause the estate unnecessary expense, and would impair the Debtor's efforts to reorganize and maintain the value of its estate. The Bank Accounts comprise a part of an established Cash Management System that the Debtor needs in order to ensure

137305146.2

smooth collections and disbursements in the ordinary course of its business. The Debtor is also concerned that the disruption that would result from closing the current accounts and opening new accounts could cause creditors to become alarmed, given that these types of requests are routinely granted in Chapter 11 cases involving operating business debtors.

46. The Debtor further seeks authorization to continue operating, in the ordinary course of business, under depository or similar contracts between the Debtor and JPMC where the Bank Accounts are located. Under the usual and ordinary terms that existed under those contracts before the Petition Date, JPMC could charge back and revoke provisional credits for deposited items that are returned unpaid and charge the amounts of these items against balances from time to time on deposit in the Bank Accounts, and to assess and deduct from the Bank Accounts customary periodic service charges. The Debtor seeks authorization to continue these ordinary course practices regardless of whether those items were deposited prepetition or post-petition and regardless of whether the items are returned prepetition or post-petition.

47. The cash management procedures employed by the Debtor constitute ordinary and essential business practices similar to those used by other enterprises in the restaurant industry. The Cash Management System provides significant benefits to the Debtor, including the ability to: (a) control and centrally manage funds; (b) ensure the availability of funds when necessary; and (c) reduce administrative costs by facilitating the movement of funds and the development of more timely and accurate balance and presentment information.

48. Requiring the Debtor to adopt new, segmented cash management systems at this critical stage of this case would be unduly expensive, would create unnecessary administrative problems, would negatively affect the Debtor's usual and ordinary operations, and would be much more disruptive than productive. Consequently,

137305146.2

maintaining the existing Cash Management System during this case is in the best interests of all creditors and other parties in interest.

49. The Cash Management System allows the Debtor to centrally manage all its cash-flow needs and includes the necessary accounting controls to enable the Debtor, as well as creditors, the US Trustee, and the Court, if necessary, to trace funds through the system and to ensure that all transactions are adequately documented and readily ascertainable. The Debtor will continue to maintain detailed records reflecting all transfers of funds.

50. Because of the nature and scope of the Debtor's business operations and the number of vendors and other parties with whom the Debtor regularly deals, the Debtor must be permitted to continue to use its existing Business Forms without alteration or change. Every party with whom the Debtor does business using the Business Forms will receive direct notice of the commencement of this case, so changing the Business Forms is unnecessary.

51. The Debtor deposits cash in the Bank Accounts with the primary goal of protecting principal and facilitating cash management. The Debtor believes that, as one of the largest and most highly-capitalized financial institutions in the world, JPMC can adequately hold all the Debtor's cash without material risk, alleviating the need for a "corporate surety." (Any corporate surety that might be obtained to guarantee the safety of the Debtor's deposits would not have any greater financial strength than the combination of FDIC insurance and JPMC's own financial stability.)

**Lease Rejection Motion**

52. Because the four Closed Locations were severely underperforming, have now closed, and no longer represent anything more than a burden to the Debtor's estate, the estate's best interests are best served by the Debtor's rejection of the Leases as of the Petition Date, saving the estate some $126,000 a month in administrative rent

alone, to say nothing of the tens of thousands of dollars of other expenses (utilities, employment costs, etc.) with the Leases. After analyzing the Leases and the market for restaurant space in the Phoenix and Austin areas, the Debtor does not believe any of the Leases is sufficiently valuable to warrant marketing any of them for assumption and assignment or other disposition of the Leases. The Debtor vacated the Closed Locations before the Petition Date and surrendered possession of the Closed Locations to the landlords.

53. The Debtor believes that the costs associated with liquidating any personal property assets remaining at any of the Closed Locations—mostly restaurant furniture and kitchen equipment, since the Debtor recovered perishable food items, liquor, computers, and business records from the Closed Locations before the Petition Date—would almost surely exceed the value that could be obtained by relocating and then selling those assets through a Court-approved restaurant liquidator. Accordingly, the Debtor believes that the personal property at the Closed Locations is of inconsequential value and a burden to the estate and should be abandoned in the Debtor's discretion.

**Application to Employ Perkins Coie LLP**

54. Perkins Coie has obtained a detailed familiarity with the Debtor's business, capital structure, and financial affairs. Jordan Kroop began advising the Debtor in June 2015 when it began pursuing its ultimate acquisition from a Chapter 11 bankruptcy case (*In re Z'Tejas Scottsdale, LLC, et al.*) of the restaurant assets it now owns. Perkins Coie served as the Debtor's counsel throughout that acquisition and continued to provide legal services to the Debtor regarding its ongoing operations. Over the last several weeks, Jordan Kroop has helped the Debtor's management analyze its operational needs, its liquidity crisis, and its legal and financial options. When it became clear that a Chapter 11 filing was in the best interests of the Debtor and its creditors, the Debtor engaged Perkins Coie to serve as general bankruptcy

24

counsel in connection with the planning and implementation of this Chapter 11 case. Perkins Coie has the necessary background to deal effectively with the full range of potential legal issues and problems that may arise in the context of this Chapter 11 case.

55. Perkins Coie believes it has assembled a highly qualified team of attorneys to serve the Debtor during its reorganization. Jordan Kroop is a partner in Perkins Coie's Bankruptcy and Restructuring group and will lead the representation of the Debtor in this case. He has more than 23 years' experience in reorganization cases representing business debtors, lenders, creditors' committees, and acquirers in both locally- and regionally-focused cases and in cases of national scope.

56. On October 18, 2017, in accordance with Perkins Coie's engagement agreement with the Debtor before the Petition Date, Perkins Coie requested and received an advance payment in the amount of $50,000 (the "**Advance**") to compensation Perkins Coie for its fees and expenses to be incurred in the preparation of the Debtor's Chapter 11 filing. Previously, Perkins Coie invoiced the Debtor monthly for services rendered in the ordinary course of business before the Petition Date and the Debtor satisfied each of those invoices in the ordinary course of business in full while Perkins Coie held a previous retainer (the "**Retainer**") in an amount—$7,481.00— well in excess of any one invoice. Perkins Coie's services in connection with the preparation for this Chapter 11 case were confined to the month of October 2017. Fees and expenses associated with those services totaled, on a time and materials basis, more than $50,000 but, after applying the previous retainer, Perkins Coie agreed when it received the Advance that its compensation would be limited to the Advance and that it would waive any entitlement to amounts incurred prepetition in excess of the Advance.

57. The Debtor believes that Perkins Coie is well qualified to represent the Debtor effectively and efficiently in this Chapter 11 case. Perkins Coie's resources, capabili-

137305146.2

ties, and experience in advising the Debtor are crucial to a successful case outcome. As such, the Debtor believes that employing Perkins Coie is in the best interests of the Debtor, its estate, its creditors, and all parties-in-interest.

October 30, 2017

_s/ Michael Stone_
Michael Stone

137305146.2